UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
06-CV-4307(JMR/FLN)

UnitedHealth Group Inc.          )
                                 )
          v.                     )          ORDER
                                 )
Wilmington Trust Co.             )

This dispute centers on the meaning of a single provision of an Indenture.

On March 2, 2006, plaintiff, UnitedHealth Group Inc. ("UHG"), publicly issued $850 million principal aggregate of 5.8% senior Notes, due March 15, 2036 ("Notes"). The Notes were issued pursuant to an Indenture, dated November 15, 1998. Defendant, Wilmington Trust Co., serves as the Indenture trustee. Defendant claims plaintiff defaulted on the Notes under the terms of the Indenture, and seeks accelerated payment on the Notes and concomitant enormous instantaneous profit.[1]

UHG asks the Court to find no breach of contract. The matter is before the Court on cross-motions for summary judgment. Plaintiff's motion is granted; defendant's motion is denied.

I.  Background

Plaintiff is a publicly-traded health and well-being company headquartered in Minnesota. On November 15, 1998, it entered into

---

[1]See, "Proceed to judgment. By my soul I swear there is no power in the tongue of man to alter me: I stay here on my bond." William Shakespeare, Merchant of Venice, IV, I, 240-42, in The Riverside Shakespeare, 254, 277 (1974).

an Indenture, with The Bank of New York ("BNY") as trustee. Pursuant thereto, on March 2, 2006, plaintiff issued the Notes due March 15, 2036.

Defendant, Wilmington Trust Co., succeeded BNY as trustee for the Notes, effective January 18, 2007.  The Indenture charges the trustee with protecting the Noteholders' interests in the event of default.  Indenture § 801(i).  The Indenture defines default, and establishes the parties' rights in such an event.

Because UHG shares are publicly traded, it must comply with the public disclosure and filing requirements of the Securities and Exchange Commission ("SEC").  The Indenture, at § 504(i), requires plaintiff to provide copies of SEC filings to the trustee:

> So long as any of the Securities remain Outstanding, the Company shall cause copies of all current, quarterly and annual financial reports on Forms 8-K, 10-Q and 10-K, respectively, and all proxy statements, which the Company is then required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act to be filed with the Trustee and mailed to the Holders of such series of Securities at their addresses appearing in the Security Register maintained by the Security Registrar, in each case, within 15 days of filing with the Commission.  The Company shall also comply with the provisions of TIA [Trust Indenture Act] ss. 314(a).

As has become well known, during the first half of 2006, UHG came under public scrutiny for its back-dating of, and accounting for, employee stock options.  When this practice came to light, UHG began a major review of its financial affairs.  The company formed a committee of Directors to review its financial

information and public declarations concerning these matters -
including SEC filings.

UHG anticipated that the committee's findings might
necessitate a change in the company's financial accounting and
restatement of its previously-filed SEC disclosures.  In light of
this on-going review, UHG opted against filing an SEC Form 10-Q
for the second quarter of 2006, due August 9, 2006.  Instead, on
August 10, 2006, the company filed SEC Form 12b-25, "Notification
of Late Filing."

SEC regulations provide that a securities registrant may
delay filing a Form 10-Q and still comply with reporting
requirements by filing a Form 12b-25 not later than one day after
the 10-Q was due.  17 C.F.R. § 240.12b-25(a).  The regulations
further provide that a company that files its Form 10-Q within
five days of the original due date, after having filed a timely
12b-25, is deemed to have filed the 10-Q on the original due date.
17 C.F.R. § 240.12b-25(b).

Plaintiff's 12b-25 filing included detailed financial
information almost identical to that contained in a Form 10-Q.
UHG disclosed the reasons for its delay, as required by the
regulations, and stated it did not anticipate that the financial
information it later would provide in the 10-Q would differ
materially from that in the 12b-25.  A copy of this 12b-25 was
delivered to defendant on August 14, 2006.

On August 25, 2006, the registered holder of record of the Notes, Cede & Company, sent plaintiff a Notice of Default on behalf of certain Noteholders.  Those Noteholders collectively owned at least 25% of the principal amount of the outstanding Notes.[2]  Cede's Notice claimed UHG's failure to timely file a Form 10-Q for the second quarter of 2006 constituted a default under Section 504(i) of the Indenture.  Invoking Sections 701(v) and 702 of the Indenture, Cede told plaintiff that a failure to cure the alleged default within 60 days of its Notice of Default would constitute an Event of Default, as a result of which the Noteholders would seek acceleration of the Notes.  Plaintiff publicly disclosed the Notice of Default in an SEC Form 8-K, filed August 28, 2006, stating it did not believe it was in default, and intended to defend itself.

On October 15, 2006, plaintiff filed another SEC Form 8-K, reporting its committee of Directors' findings and recommendations concerning UHG's stock option practices.  In this disclosure, the company stated it was still deciding whether it needed to restate its previously-filed financial statements, and planned to delay filing its Form 10-Q for the third quarter of 2006.

On October 25, 2006, plaintiff filed this declaratory judgment action against Cede and BNY, the trustee at the time.  On

---

[2]Pursuant to Section 702 of the Indenture, the right to declare default and demand acceleration of the Notes may be exercised by the trustee or holders of 25% or more of the series.

October 30, 2006, Cede, again acting on behalf of certain Noteholders, sent plaintiff and BNY a "Notice of Acceleration" requesting acceleration of the Notes for the default alleged in its August 25, 2006, Notice of Default.[3]

On March 6, 2007, plaintiff filed Form 10-Q with the SEC for the second quarter of 2006, and sent a copy to the trustee. That same day, it submitted an amended Form 10-Q for the first quarter of 2006, a Form 10-Q for the third quarter of 2006, and a Form 10-K for the year ending December 31, 2006. The financial information contained in the second quarter 2006 Form 10-Q differed from that provided in the August 10, 2006, Form 12b-25 by less than 1%. During the period of delay, plaintiff continued to pay interest on the Notes and meet all other obligations under the Indenture.

Pursuant to the parties' stipulation, Wilmington Trust Company was substituted as the trustee defendant when it succeeded BNY as the Indenture trustee, effective January 18, 2007. Plaintiff then voluntarily dismissed Cede as a named defendant on August 13, 2007. Thus, the only remaining defendant is Wilmington Trust. Both parties have moved for summary judgment.

---

[3]It is irrelevant, but charming, to note that the hedge funds, on whose behalf Cede acted, actually increased their interest in the Notes by not less than $55.8 million between the date Cede filed its Notice of Default and the date it sent the Notice of Acceleration.

II.  Legal Standard

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986).  As there are no disputed facts and the issue in dispute must be decided as a matter of law, the matter is ripe for summary disposition.

This case turns on the correct interpretation of a single provision of the Indenture, Section 504(i), in light of Section 314(a) of the Trust Indenture Act ("TIA"), a statute expressly incorporated into the Indenture.  The Indenture and its terms are governed by New York law.  Indenture § 1306.

New York law is clear, and frankly, unsurprising.  "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  Cruden v. Bank of N.Y., 957 F.2d 961, 976 (2d Cir. 1992).  Where contractual language is clear, words and phrases used in an indenture must be given their plain meanings.  Whitebox Convertible Arbitrage Partners, L.P. v. IVAX Corp., 482 F.3d 1018, 1021 (8th Cir. 2007).  A contract must be interpreted in its entirety, with all parts reconciled so as to avoid an inconsistency.  Laba v. Carey, 277 N.E.2d 641, 644 (N.Y. 1971).  Parties to an agreement are not obligated to perform duties beyond those mandated by the unambiguous terms of the

6

indenture.  See Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999).

Three courts have considered language similar to Section 504(i) of the Indenture.  Plaintiff points to two federal district court decisions, both of which found an issuer, under indenture language similar to that in this case, has no obligation to file SEC reports on any particular timetable.  See Affiliated Computer Servs., Inc. v. Wilmington Trust Co., No. 03-CV-1770, 2008 WL 373162 (N.D. Tex. Feb. 12, 2008); Cyberonics, Inc. v. Wells Fargo Bank Nat'l Ass'n, No. H-07-121, 2007 WL 1729977 (S.D. Tex. June 13, 2007).  In reply, defendant touts an unpublished New York state trial court decision, Bank of N.Y. v. Bearing Point, Inc., 824 N.Y.S.2d 752 (N.Y. Sup. Ct. Sept. 18, 2006) (unpublished table decision), which decided to the contrary.

None of the decisions are binding on this Court. See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991) (federal district court's determination of state law not entitled to deference); Dubai Islamic Bank v. Citibank, N.A., 126 F. Supp. 2d 659, 669 n. 14 (S.D.N.Y. 2000) (unpublished decision of the New York Supreme Court "entitled to respectful consideration" but is of "little (or no) precedential value").  When attempting to ascertain the views of New York's highest court, this Court is free to disregard a lower state court's decision if "it is convinced . . . that the highest court of the state would decide otherwise."  Holden Farms, Inc. v. Hog Slat, Inc., 347 F.3d 1055,

1066 (8th Cir. 2003).  It seems likely, but the Court need not
find, that the Bearing Point court felt compelled to reexamine its
decision when it granted a motion for rehearing.[4]

III.  Analysis

     The Court finds, based on the Indenture's plain meaning, that
plaintiff  fulfilled  its  contractual  duties  when  it  provided
defendant with copies of its SEC filings within 15 days of their
being  filed  with  the  Commission.   Similarly,  TIA  Section  314
requires only that plaintiff provide the trustee with copies of
SEC filings, establishing no deadline whatsoever.   Accordingly,
plaintiff's delay in filing its Form 10-Q does not violate the
Indenture's terms.  For these reasons, plaintiff has not defaulted
on the Notes.

     A.  Plain Meaning of the Indenture

     The Court finds Section 504(i) of the Indenture is clear and
unequivocal.  By its terms, "the Company [plaintiff] shall cause
copies of all current, quarterly and annual financial reports on
Forms 8-K, 10-Q and 10-K, respectively, and all proxy statements,
which the Company is then required to file with the Commission
pursuant to Section 13 or 15(d) of the Exchange Act to be filed
with  the  Trustee  .  .  .  within  15  days  of  filing  with  the
Commission."

_____

     [4]Plaintiff asks this Court to read tea leaves left over when
the  New  York  state  trial  judge  granted  rehearing.   The  Court
declines to do so.   The New York case died because the parties
settled prior to rehearing.

From a purely grammatical standpoint, the phrase "which the Company is then required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act" modifies the Indenture's contractual obligation to send copies by specifying those financial reports the Company is obligated to file. Sections 13 and 15(d) of the Exchange Act are the impetus by which certain financial reports will be provided. The modifying phrase expressly incorporates sections 13 and 15(d) only to the extent that those statutes mandate which financial reports must be produced. It answers the question, in what circumstance or situation must the Company create a "current, quarterly, or annual financial report on Forms 8-K, 10-Q and 10-K?"

The Court considers that it is the Exchange Act, not the Indenture, which compels UHG to produce a particular report. The Indenture's language merely requires UHG to provide the trustee with copies of the submissions which are required by the Act. Once a report is filed with the SEC, Section 504(i) requires plaintiff to send the trustee a copy within 15 days.

The Court finds the pivotal language is the section's requirement that plaintiff provide those submissions it "is then required to file with the Commission." Exchange Act regulations require "large accelerated filers" like plaintiff to file quarterly reports on a Form 10-Q within 40 days after the end of a fiscal quarter. See 17 C.F.R. §§ 240.12b-2, 240.13a-13, 249.308a(a)(1). But the regulations recognize that a company is

not always in a position to produce accurate financial reports within that time.  On such occasions, a company unable to produce a timely Form 10-Q is required to notify the SEC of its late filing, and the reason therefor, in a Form 12b-25.  17 C.F.R. § 240.12b-25(a).

Here, while UHG was reviewing its options practices and consequently reexamining its financial statements, it timely filed the SEC's Form 12b-25 "Notification of Late Filing."  By doing so, it was relieved of any immediate requirement to file the otherwise regularly-scheduled Forms 10-Q and 10-K.  After UHG completed its reexamination, it then filed Form 10-Q for second quarter 2006. Thus, the Court finds plaintiff complied with its obligation to produce and copy to the trustee reports "it was then required to file with the Commission."

Defendant claims this interpretation renders Section 504(i) meaningless, arguing that anyone may access SEC filings on the SEC's website, using the EDGAR database.  This argument is disingenuous.  Certainly, today such documents are easily available.  But such was hardly the case when the parties drafted their agreement.  When this Indenture was drafted in 1998, the internet was not as commonly used as it is today.  But more than that, SEC filings were certainly not available online in 1983 when the American Bar Association drafted its Model Simplified Indenture, upon which this Indenture is based.  See 38 Bus. Law 741 (1983).  Finally, the simple fact that reports are available

10

online does not ensure the trustee will access them. The parties bargained for direct access to SEC reports, and imposed upon UHG the duty of providing them. The Indenture's terms have been satisfied.

The parties could have contractually specified that Forms 10-Q be filed on a particular timetable, lest the borrowed sums be placed in jeopardy. Had they wished to explicitly incorporate the Exchange Act's timing requirements, there was no bar to doing so. See Cyberonics, 2007 WL 1729977, at *4. But this is not the agreement they made.

No party denies that this Indenture was the result of negotiations between sophisticated parties, armed to the teeth with high-powered lawyers. Certainly, the document was based on a form, but this was an $850 million dollar transaction. The parties could have selected different language, under which the issuer could have been required to file particular reports with the SEC at a specified time. The parties, however, neither selected nor crafted such an agreement.

When the language of a contract is unambiguous, as it is here, the Court may not impose obligations on a party beyond those expressly stated. See Red Ball, 173 F.3d at 484. Were the Court to conclude the Indenture requires plaintiff to produce reports at a particular time rather than simply providing a copy of financial reports at the time those reports are filed with the SEC, the Court would be redrafting and expanding the Indenture's limited

11

incorporation of sections 13 and 15(d) of the Exchange Act.  This is an invitation the Court must decline.

There is no dispute that plaintiff filed with the SEC its second quarter 2006 Form 10-Q on March 6, 2007, and sent the trustee a copy that same day, well within the Indenture's 15-day requirement.  The Indenture's term was thereby satisfied.

B.  Trust Indenture Act Requirements

Defendant next argues that, even if the Indenture does not require timely filings, the requirement is statutorily imposed by the TIA.  Section 504(i) of the Indenture incorporates TIA section 314(a), which states:

> Each person who . . . is or is to be an obligor upon the indenture securities covered thereby shall: (1) file with the indenture trustee copies of the annual reports and of the information, documents, and other reports . . . which such obligor is required to file with the Commission pursuant to [section 13] or [section 15(d)] of [the Securities Exchange Act] . . . .

15 U.S.C. § 77nnn(a).

As the TIA is statutory, its requirements cannot be reduced or omitted by an indenture or any other private agreement.  15 U.S.C. § 77rrr(a) (if indenture "limits, qualifies, or conflicts with" TIA section 314(a), the statute controls).  This, however, does not help defendant, because the TIA imposes no new or additional SEC filing requirements.

Applying a plain meaning to TIA Section 314(a), one again sees the requirements imposed under the Indenture's Section 504(i).  The TIA's reference to sections 13 and 15(d) of the

Exchange Act specifies the particular reports the obligor must provide to the trustee; it does not incorporate, either explicitly or implicitly, SEC timing requirements.  Section 314(a) contains no timing requirement whatsoever, nor does it define the time by which copies must be delivered to the trustee.  In this regard, the TIA requires even less of plaintiff than the Indenture.  See Cyberonics, 2007 WL 1729977, at *4.

Defendant claims such a reading renders Section 314(a) a nullity, again falling on the SEC internet sword.  But the mere fact of today's electronics does not allow a court to contort a statue beyond its meaning.  The Court's plain language analysis comports with the reality of the TIA, drafted as it was in 1939.  At that time there was no technology by which copies of SEC reports could be easily obtained, and companies did not routinely provide reports to holders of corporate debt.  See H.R. Rep. No. 1016, 35 (1939).  Under the circumstances existing when Congress drafted the TIA, this provision was clearly intended to assure trustees access to up-to-date information concerning a company's financial status by requiring that they receive a copy of any filed reports.  Id.

Defendant next argues that holding Section 314(a) to merely require delivery of filed reports would frustrate the TIA's purpose of keeping Noteholders fully and fairly informed.  H.R. Rep. No. 1016, at 35, 52 (1939).  This argument is a sophistry: defendant cannot seriously argue it did not know plaintiff's

13

financial picture prior to its filing the second quarter 2006 10-Q on March 6, 2007. The Court will completely set aside the blizzard of news in the financial and popular press. But the trustee cannot deny that virtually all of this information was disclosed in UHG's Form 12b-25, filed with the SEC and copied to defendant on August 10, 2006. Defendant's effort to accelerate the Notes was not caused by a lack of information, but by its desire to realize a windfall.

    C.  <u>Good Faith and Fair Dealing</u>

Finally, defendant claims plaintiff breached New York's contractually implied covenant of good faith and fair dealing. Plaintiff's claim for summary judgment on this counterclaim is granted.

Under New York law, every contract carries "an implied covenant of good faith and fair dealing, which precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." <u>Filner v. Shapiro</u>, 633 F.2d 139, 143 (2d Cir. 1980). Even if a party complies with the letter of an agreement, it may still be in breach of the implied duty of good faith and fair dealing if its conduct "destroy[s] or injure[s] the right of another party to receive the benefits of the contract." <u>Chase Manhattan Bank, N.A. v. Keystone Distributors, Inc.</u>, 873 F. Supp. 808, 815 (S.D.N.Y. 1994).

There is no question this implied covenant exists under New York law. But the Court finds, as matter of law, that UHG has not

14

breached the covenant; it has timely made each and all payments on the Note; it has not violated the Indentures's plain language; and it has complied with its statutory reporting duties.  Further, it has undertaken a massive review of its stock option granting practices and restated its financial health, all of which has been seasonably disclosed to the SEC and, indeed, to the trustee.

Beyond this, plaintiff's delay in filing its Form 10-Q occurred with the SEC's blessing.  SEC regulations provide a mechanism by which a company is permitted to delay its financial report filings, see 17 C.F.R. § 420.12b-25(a).  This regulation advances the SEC's regulatory function, because a company is prohibited by law from filing a Form 10-Q which it knows to be inaccurate or misleading.  See 15 U.S.C. § 7241(a).  To find plaintiff in breach of the implied covenant of good faith and fair dealing because it did not meet the standard deadline for filing its Form 10-Q would require the Court to ignore Exchange Act regulations which permit delay and require reliable filings.  The SEC is empowered to sanction companies which might abuse this protection, assuring it will not be used to unreasonably delay dissemination of necessary market information.  See 15 U.S.C. § 78l(j); In re Gateway Int'l Holdings, Inc., Exchange Act Release No. 34-53907 (May 31, 2006).  This Court easily finds UHG took all legal and reasonable steps to provide its Noteholders the full benefit the contract - plaintiff timely paid them their interest and kept them abreast of the most accurate financial information

it had at the time.

If the principle that one who seeks equity must do equity means anything, the Noteholders' suggestion that they should reap a windfall profit from UHG under these circumstances should turn to stone in their mouths.  Certainly UHG has had some corporate difficulties.  But upon discovering its problems, it has fully complied with its legal and contractual obligations.  Good faith and fair dealing ought not to be used as a sword to skewer a party who does so, most particularly where the supposedly aggrieved party is unable to show the meanest hint of any injury or damage to themselves.

For these reasons, the Court finds plaintiff has fully complied with its implied duty of good faith and fair dealing when it delayed filing its Form 10-Q for the second quarter of 2006.

IV.  <u>Conclusion</u>

Accordingly, IT IS ORDERED that:

1.  Plaintiff's motion for summary judgment [Docket No. 39] is granted.

2.  Defendant's motion for summary judgment [Docket No. 45] is denied.

3.  The timing of plaintiff's filing of its Form 10-Q for the second quarter of 2006 did not constitute a default under the Indenture.

16

4.  Defendant's counter-claims are dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March <u>10</u>, 2008

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States Chief District Judge